UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RAMSAY R. GOURD, | : | CIVIL ACTION NO. |
| | : | 18 cv 00582 (JBA) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| INDIAN MOUNTAIN SCHOOL, INC., | : | |
| | : | |
| Defendant. | : | APRIL 30, 2019 |

**FIRST AMENDED COMPLAINT**


I.      **Jurisdiction and Venue**

1.      Jurisdiction obtains pursuant to 28 U.S.C. § 1332(a).

2.      The plaintiff resides in and is a citizen of the State of Vermont.

3.      The defendant is a non-stock corporation formed pursuant to the laws of

the State of Connecticut with its principal place of business in the State of Connecticut.

4.      The amount in controversy vastly exceeds the statutorily required

$75,000.00, exclusive of interest and costs.

5.      Venue lies in this District pursuant to 28 U.S.C. § 1391(a) in that the

defendant resides in this District and the events, acts and omissions giving rise to the

plaintiff's claims occurred in this District.

## II.     <u>Parties</u>

6.      Ramsay Gourd attended Indian Mountain School from September 1977 to June 1980, when he was 12-15 years old.

7.      Indian Mountain School, founded in 1922, is an exclusive private boarding and day school for boys and girls in kindergarten through ninth grade, in Lakeville, Connecticut.

## III.    First Claim for Relief (Negligence):

8.      At the time of the sexual abuse and assaults described in this Complaint, Indian Mountain School charged thousands of dollars per year for the privilege of attending the school and residing on school grounds.

9.      In exchange for the substantial monetary compensation charged to Ramsay's mother, and to the parents of the other minor children in the school's care and custody, Indian Mountain School assumed responsibility for, among other things, the students' protection, safety and wellbeing.

10.     The health and welfare of the students was the school's highest priority.

11.     The school accepted the duty and responsibility to keep the children in its care and custody safe from harm.

12.     The school owed Ramsay and the other minor children in its care and custody a duty to do everything within its power to protect them from sexual abuse by school employees.

2

13.     At the time of the sexual abuse and exploitation described in this Complaint, Connecticut law (Conn. Gen. Stat. Sec. 17-38a) required Indian Mountain School, the school's Headmaster and Assistant Headmaster, the school's teachers, its staff psychiatrist, and its registered nurse to report suspected child sexual abuse to state child welfare and law enforcement authorities.

14.     At the time of the sexual abuse and exploitation described in this Complaint, Connecticut law (Conn. Gen. Stat. Sec. 17-38b) required Indian Mountain School, the school's Headmaster and Assistant Headmaster, the school's teachers, its staff psychiatrist, and its registered nurse to immediately report to state child welfare authorities if they had reasonable cause to believe that one or more students were in danger of being sexually abused, even if they did not have reasonable cause to suspect that any such abuse had actually occurred.

15.     Notwithstanding these duties, responsibilities and promises, at the time Ramsay entered and attended Indian Mountain School, the school employed English teacher Christopher Simonds, a pedophile who preyed and had for years been preying on vulnerable children in the school's care.

16.     Notwithstanding the school's duties, responsibilities and promises, at the time Ramsay entered and attended Indian Mountain School, the school, acting through its Board of Trustees, its officials and administrators, its faculty, its staff psychiatrist, and its registered nurse knew and should have known that Simonds was a pedophile

who preyed and had for years been preying on vulnerable children in the school's care.

17.     Notwithstanding the school's duties and responsibilities, and the mandatory requirements of Connecticut law, before and at the time Ramsay entered and attended Indian Mountain School, the school, acting through its Board of Trustees, its officials and administrators, its faculty, its staff psychiatrist, and its registered nurse, failed and refused to report suspected child sexual abuse at the school and the danger and threat of future child sexual abuse at the school to state child welfare and law enforcement authorities.

18.     Christopher Simonds sexually abused, assaulted, molested, exploited and threatened Ramsay when Ramsay was a vulnerable and defenseless boy at the school.

19.     Simonds had been a teacher at Indian Mountain School since 1973; and during his four years at the school prior to the time that he molested and threatened Ramsay, he manipulated, groomed, and sexually abused, assaulted, molested, fondled, sodomized and raped dozens of other school boys.

20.     As part of his manipulation and grooming of young boys during his years at the school prior to sexually assaulting, abusing and threatening Ramsay, Simonds routinely showed pornographic pictures and films to the boys, and he gave them cigarettes, alcohol, and marijuana.

21.     Simonds also gave children at the school cocaine and LSD.

22.     Simonds took photographs of the boys while they were naked and involved in sex acts; and he used the photographs to blackmail the boys into gratifying his predatory and perverse sexual desires and into remaining silent about his continuing abuse.

23.     Headmaster Peter Carleton, Assistant Headmaster Steven Carver, multiple other faculty members and staff, and the Indian Mountain School Board of Trustees knew and should have known of Simonds' abusive and manipulative conduct and his ongoing and frequent sexual abuse of the defenseless boys entrusted to the school's care.

24.     During his entire tenure as Headmaster, Carleton was a member of the Indian Mountain School Board of Trustees.

25.     Carleton first learned of Simonds' sexual interest in young boys from, among other sources, Steven Carver, a teacher and Assistant Headmaster of Indian Mountain School, Michele Nemiroff, a teacher at the school, and Bernice Harned, the school's registered nurse.

26.     Carver learned in or about the Spring of 1977 that Simonds possessed hard core child pornography, including 8 mm films, magazines, and photographs depicting adults sexually assaulting and abusing pubescent and pre-pubescent boys and girls.

27.     At the time Carver learned of Simonds' possession of hard core child porn, Ramsay Gourd was a 12-year old child finishing his seventh grade at Indian Mountain School:  Simonds had been abusing him since the beginning of the year.

28.     According to Carver's sworn testimony, Simonds' pornography, some of which Carver had confiscated from the basement of Simonds' apartment on campus, consisted of "people engaging in oral, anal and vaginal intercourse.  There was a fair amount of heterosexual activity.  There was also quite a bit of homosexual activity, male with male, and a lot of it fairly young, you know, like, twelve to sixteen year old males."

29.     In sworn testimony, Carver later described the pornography, some of which showed adults forcing children to have sex with each other, as the "worst pornography" he'd ever seen.

30.     In or about the spring of 1977, Carver showed the child pornography to the school's staff psychiatrist, Charles S. Mirabile, Jr., and to the school's registered nurse, Bernice Harned.

31.     In sworn testimony, Nurse Harned later described some of Simonds' child pornography this way: "I remember they were pictures of what I would term Dutch children because of their specific haircuts.  And there were magazines.  And they were of girls and girls and boys and boys in homosexual and sexual acts....  They were of naked children.  Younger children.  They were not adults....  I would say, up to and including nine or ten years old."

6

32.     Nurse Harned testified: "I remember specifically that there was a label, I believe it was a mailing label, to Chris Simonds."

33.     Nurse Harned later testified under oath that, when she and Assistant Headmaster Carver showed Simonds' pornography to the school's staff psychiatrist, Dr. Mirabile, she told Mirabile that she "was concerned because Chris Simonds was always touching and hugging the students and especially those in his special photography group or club."

34.     It was known and should have been known to Indian Mountain School administrators, faculty, staff and the Board of Trustees, before and during Ramsay's attendance at the school, that Simonds surrounded himself with a group of young male students known as "Simonds' boys" and "Simonds' pets".

35.     Ramsay was a member of this group; he was one of "Simonds' pets".

36.     Many of these boys were members of Simonds' "print club".

37.     The "print club" met in a basement room, locked with a padlock to which only Simonds had a key, in one of the buildings on campus.

38.     Nurse Harned later testified under oath that she observed Simonds "touching the certain group of students more intimately than he did anyone else at the school," and the "group of students" was "his print club, his photography club."

39.     When Carver and Harned showed Simonds' pornography to Dr. Mirabile, Harned told Mirabile that Simonds "did touch and feel" his favored boys, and that Simonds "would allow them to come over to his home at odd hours."

40.     Around this same time, in or about the Spring of 1977, Harned told all of this same information about Simonds' child pornography and his predilection for the young boys in his "print club" and his inappropriate touching and feeling of the boys to the then outgoing Headmaster Dick Rouse, and to the President of the Board of Trustees, William Cuddy.

41.     During his entire tenure as Headmaster, Rouse was a member of the Indian Mountain School Board of Trustees.

42.     In or about the summer of 1977, Carver showed Simonds' hardcore child pornography to the school's incoming Headmaster and Board Member, Peter Carleton; and Nurse Harned told Carleton all of the same concerns about Simonds' inappropriate touching and feeling of young boys that she had previously shared with Dick Rouse and William Cuddy.

43.     Each of these Indian Mountain School employees and officials knew that the child pornography belonged to Simonds.

44.     It was a crime under Connecticut law for Simonds to possess the child pornography.

45.     Each of these Indian Mountain School employees and officials were required by Connecticut law to immediately report Simonds' possession of the child pornography and his inappropriate behavior to state child welfare authorities.

46.     Also in or around 1977 – Ramsay's seventh grade at the school – Carver learned from a former Indian Mountain School student that Simonds was known to be sharing his hardcore pornography with students.

47.     School administrators, faculty and the Board of Trustees knew and should have known that "Simonds' boys" were victims of Simonds' sexual abuse and exploitation.

48.     From 1977 onward – including the entirety of Ramsay Gourd's eighth and ninth grade years at Indian Mountain School – Assistant Headmaster Carver suspected that Simonds was a pedophile.

49.     Before and during Ramsay's attendance at the school, Carleton, Carver and other members of the school faculty, staff and Board of Trustees knew and should have known that Simonds frequented the boy's dormitory and individual boy's rooms after lights out.

50.     Before and during Ramsay's attendance at the school, Carleton, Carver and other members of the school faculty, staff and Board of Trustees knew and should have known that Simonds invited boys to his apartment after lights out.

51.     On at least one occasion, upon learning that one of the boys was missing from his room late at night, Carleton and Carver went directly to Simonds' apartment searching for the boy.

52.     Simonds came to the door in his underwear and admitted that, in fact, the boy was in his apartment at that moment.

53.     Before or during Ramsay's attendance at the school, school officials created a policy prohibiting faculty from visiting with boys after lights out.  The policy was created specifically to address Simonds' frequent visits to the boys' dorms and various boys' frequent visits to Simonds' apartment late at night.

54.     Notwithstanding the policy, Simonds continued to visit with boys in their rooms and in his apartment late at night; Carleton and Carver, and other school administrators, faculty, staff and the Board of Trustees knew and should have known that he continued to do that, but they failed and refused to stop it.

55.     Notwithstanding the policy, Headmaster Peter Carleton also entered the boys' dormitories and individual boy's rooms late at night after lights out, including on one occasion when Carleton, obviously drunk, climbed through the window of one of the boy's rooms, and then marched Ramsay and some other boys around campus wearing only their underwear.

56.     Prior to and during Ramsay's attendance at Indian Mountain School, Assistant Headmaster Carver concluded that Simonds was a danger to the students and that he should not be employed at the school.

57.     Prior to and during Ramsay's attendance at Indian Mountain School, other school administrators, faculty, staff and the Board of Trustees knew and should have known that Simonds was a danger to the students and that he should not be employed at the school.

58.     Among all of the other evidence of Simonds' perverted tendencies and predatory yearnings, he posted sexually explicit and pornographic messages on the school's computer, where they were seen and read by school children.  Carver and Carleton knew about these messages; the Board of Trustees knew and should have known about them.

59.     In or about 1984, Carleton learned that Simonds was actively preying on and sexually abusing boys at the school.  The Board of Trustees knew and should have known that same information; but, other than discussing the charges with Simonds in the headmaster's office, Carleton and the Board took no meaningful action to protect the boys or to warn the boys or their parents, or to reach out to help Simonds' previous victims, including Ramsay, so that their suffering could be recognized and appropriately treated.

60.     Despite knowing of Simonds' history of perverted, manipulative and sexually abusive and exploitive treatment of young boys, and despite knowing that the school housed and employed a sexual predator and pedophile, the Board, the Headmaster, the Assistant Headmaster, the school's staff psychiatrist, the school's registered nurse, and the school's lawyer allowed this sick and dangerous man to continue to have unfettered access to young vulnerable boys to satisfy his prurient sexual desires.

61.     Despite knowing that a teacher at the school with daily access to dozens of young boys was an active and prolific pedophile, and despite knowing that Simonds

11

had sexually abused and was continuing to routinely sexually abuse vulnerable and defenseless boys in the school's custody, from 1973 to 1985 no meaningful steps were taken by the Board of Trustees or anyone else in a position of authority and responsibility at the school to notify and warn the children and their parents, to protect the children, to fire or report or even discipline Simonds, or to do anything else in response to the certain knowledge that Simonds had left a wake of victims in his past and would strike again.

62.     Following a report by the father of a former IMS student who had been sexually abused by Simonds, the Indian Mountain School Board of Trustees met during the spring of 1985 to discuss the report.  In attendance at the meetings were Peter Carleton, Steven Carver, chairman of the Board Paul Levin, vice chairman John "Rusty" Chandler, Jr., John Virden, Kathy Metz, Jerry Clooney, and former Board member and the school's then legal counsel William Cuddy.

63.     On the way to the meeting, in an effort to cover up his responsibility for exposing generations of Indian Mountain School students to a known child molester, Carleton told Carver not to mention to the Board members any of their prior conversations concerning Simonds' hard core child pornography, Simonds' late night rendezvous with young boys, or any of the other evidence of Simonds' twisted and dangerous propensities.

64.     In a similar effort to hide and escape responsibility for his own wrongdoing, Carver complied with Carleton's request.

65.    Notwithstanding Carleton's and Carver's attempts to escape responsibility for their negligence and other misconduct, the Board of Trustees knew and should have known all of the information about Simonds' behavior and history; indeed, President of the Board William Cuddy had been told of Simonds' possession of hard-core child pornography not long after it was found.

66.    Not long after the Board meeting, in a May 24, 1985 letter to Carleton, Indian Mountain School psychiatrist Mirabile, wrote, in regards to students who might have been harmed by Simonds, "the very worst thing that could happen is that cause be given for someone to say that you or anyone else was trying to sweep something under the rug at the expense of the students."

67.    Carleton, Carver, Mirabile, the Board of Trustees, and others in positions of authority and responsibility at IMS then commenced to sweep everything under the rug at the expense of IMS students, including Ramsay Gourd.

68.    Even after the meeting in the spring of 1985 when the school's Board of Trustees decided that, because Simonds was a danger to the children, his employment at the school must end, the school did not admonish or discipline Simonds or even inform him of the Board's decision, the school allowed Simonds to continue to work at the school, and the school allowed Simonds to have access to children for the remainder of the school year and afterwards.

69.    The only precaution instituted by anyone was that Carleton and Carver took turns hiding outside Simonds' apartment between 10 p.m. and midnight for less

than one week to see if any boys visited Simonds or if Simonds left the apartment to go to the boys' dormitories.

70.     After taking turns hiding for a few days, neither Carleton nor Carver did anything else to protect the defenseless boys in the school's care and custody.

71.     Nor did Carleton, Carver or anyone else at IMS, including its Board of Trustees, do anything to identify and help the dozens or hundreds of past victims of Simonds' abuse, including Ramsay Gourd.

72.     Not only did the school fail to take steps to help protect the children, but, according to a May 24, 1985 letter to Headmaster Carleton from school psychiatrist Dr. Mirabile, Carleton, incredibly, wanted to "discuss how best to help Chris [Simonds]."

73.     Carleton and the school then did help Chris Simonds by not only failing and refusing to report him to the police and child protective services, but also by providing him with a job and with a house only a couple of miles away from the IMS campus.

74.     In a July 11, 1985 letter, Peter Carleton wrote: "Chris is happy and in a new home and likes his job.  The whole matter was a nightmare.  The father [who reported that his child had been abused by Simonds] was out to destroy.  Imagine: Threatening public exposure and a court case!"

75.     The School thereafter settled that victim's claims for an unknown amount and a confidentiality agreement prohibiting the victim from notifying anyone of the settlement.

76.     The school's failure and refusal to report Simonds, its provision of a house and a job to him, its secret settlements with multiple victims, and its other acts and omissions alleged herein were designed and intended to keep Simonds' history of sexual abuse at the school quiet so that victims and victims' parents would not learn of the school's culpability in Simonds' abuse and would not sue the school.

77.     Carleton admitted that, after the school substantiated that Simonds was a child abuser and allowed him to resign, Carleton and IMS intentionally chose not to report Simonds in order to "protect the present stability of the school…."

78.     Around the same time, IMS Board member John Chandler "expressed concern over a possible law suit by one of these victims…."

79.     IMS Trustee Paul Levin told a State Police Investigator "that the reason they wanted to hush it up is because every ten years there is an accreditation of private schools … by the Ct Association of Independent Schools…" and "[t]he main concern among [the board of trustees] was to be able to keep everything quiet in that the next year IMS was undergoing an accreditation update which is done every ten years by the Connecticut Association of Independent Schools."  The school thus put its interests above those of Simonds' victims, and took steps to prevent being sued by them.

80.     On May 24, 1985, Dr. Mirabile was informed by an attorney whom he had consulted that he had a legal "responsibility ... to report acts of child abuse even where only reasonable suspicion exists."

81.     At the same time, Mirabile wrote to Carleton that he assumed President of the Board William Cuddy "will make the same report as the law is apparently unequivocal".

82.     In fact, neither Dr. Mirabile, nor Headmaster Carleton, nor Attorney Cuddy, nor Assistant Headmaster Carver, nor Nurse Harned, nor anyone else at Indian Mountain School, including anyone on the Board of Trustees, reported Simonds' actual or suspected sexual abuse of students at the school for approximately the next seven years, and even then the meager information disclosed was inaccurate and intentionally designed to shield the school from legal action.

83.     By that time, the criminal statute of limitations had passed, and neither Simonds nor anyone else at Indian Mountain School was ever arrested, prosecuted or convicted of their role in the abuse and neglect of children at the school.

84.     Mirabile's failure and refusal to follow the plain requirements of Connecticut's child sexual abuse reporting law was consistent with his cavalier and unprofessional approach to the welfare of the Indian Mountain School students throughout his employment as the school's staff psychiatrist.

85.     For example, in a September 15, 1978 letter to Headmaster Carleton, Mirabile wrote that, even when he provided so-called "therapy" to individual Indian Mountain School students, he was actually "overtly or covertly ... serving a function that reflects the needs of the school as much as or more than the individual."

16

86.     As a result of the school's failure and refusal to warn and protect its young and vulnerable students from Simonds' predatory impulses and schemes, Simonds molested, threatened, exploited, and abused Ramsay Gourd on countless occasions while he was a student at the school, and Ramsay suffered and continues to suffer injuries from that abuse that would and could have been prevented and ameliorated if the school had acted at any time to protect him.

87.     Simonds' abuse of Ramsay began when Ramsay was 12 years old, in the beginning of his seventh grade year.

88.     For the entirety of Ramsay's seventh, eighth and ninth grade years at IMS, Simonds invited and encouraged Ramsay to visit him in his apartment on campus and in the school print shop, where he allowed and encouraged Ramsay and other boys to smoke cigarettes and pot.

89.     For the entirety of Ramsay's seventh, eighth and ninth grade years at IMS, Simonds also allowed and encouraged Ramsay to drink alcohol, and to use speed and microdot LSD.

90.     Simonds provided the drugs and alcohol.

91.     Simonds used these illicit substances to groom Ramsay and his other child victims, and to keep them silent by threatening that, if anyone found out, the children would be expelled from school and their lives would be ruined.

92.     At the beginning of Ramsay's seventh grade year, when he was only 12 years old, Simonds began sexually assaulting, molesting, and exploiting him, sometimes alone, sometimes with other boys.

93.     Simonds continued this sexual abuse throughout Ramsay's seventh, eighth and ninth grade years.

94.     For all three years, Simonds sexually assaulted, molested, and exploited Ramsay, usually in Simonds' basement or in the school print shop, from one to four times a week while school was in session.

95.     During all three years, Simonds also sexually assaulted, molested and exploited Ramsay on school outings, in Simonds' car, in the Doolittle House locker room, and in other places on and off the IMS campus.

96.     Simonds' sexual abuse included forcing Ramsay to engage in oral sex and mutual masturbation.

97.     Simonds showed Ramsay and the other children 8mm pornography films portraying adults having heterosexual and homosexual sex with each other and with children.

98.     Simonds plied Ramsay and the other boys with drugs before showing them the kiddie porn films and requiring them to masturbate.

99.     During all three years, approximately one or two times per week while school was in session, Simonds forced Ramsay and other young boys to engage in sex acts with each other while Simonds watched.

100.    During all three years, approximately one or two times per week while school was in session, Simonds forced Ramsay to watch while Simonds sexually assaulted other boys.

101.    Simonds forced Ramsay and other boys to perform group masturbation while Simonds watched.

102.    Simonds forced the boy who ejaculated last to swallow the boys' semen.

103.    Simonds took countless photographs of the boys during these and other acts of abuse.

104.    Simonds forced Ramsay and the other boys to masturbate themselves, to masturbate each other, and to masturbate him.

105.    On approximately 15 occasions, Simonds anally raped Ramsay with his fingers, a dildo, and other "toys".

106.    On approximately three occasions, Simonds forced Ramsay to anally penetrate him (Simonds) with Ramsay's finger.

107.    When Simonds raped and molested Ramsay, he smelled, sweated profusely, and wheezed.

108.    On one occasion, Simonds encouraged and allowed a group of boys to lock Ramsay in a locker and urinate on him; Simonds watched and laughed.

109.    Simonds maintained a collection of 100's of photographs depicting naked and partially-dressed boys engaged in masturbation and other sex acts in various locations on the school campus, including Simonds' basement and living room.

110.    Simonds used these photographs as a form of blackmail to force the children to continue to gratify his violent and perverse desires and to keep the children silent about the abuse.

111.    Ramsay fears that Simonds photographed him naked and engaged in sex acts with other boys, that Simonds printed and kept the photographs, and that Simonds may have shared the photographs with other pedophiles.

112.    The school's affirmative acts created, and exposed Ramsay to, a known high degree of risk of harm.

113.    The school was on actual and constructive notice of the risk and of the gravity of the harm that would result if Ramsay were sexually molested, abused, threatened or assaulted by Simonds.

114.    The school was on actual and constructive notice of the sexually aberrant behavior and propensities of Christopher Simonds.

115.    The school knew that no other person or entity would assume, or would be allowed to assume, the responsibility for preventing Simonds from molesting Ramsay.

116.    In fact, Indian Mountain School officials, trustees, administrators and teachers actually conspired to prevent others from learning about or preventing or remedying the ongoing, rampant, serial molestations being perpetrated by Simonds on the boys in the school's care and custody.

20

117.   The school created a situation that it knew and should have known was likely to be dangerous to Ramsay and to the other young children in its care.

118.   Despite having created the dangerous situation, the school failed and refused to take appropriate precautions against the risk of harm.

119.   Not only did the school fail and refuse to protect Ramsay and the other school children from the sexual predator in their midst, it expected the boys to protect themselves, it blamed them when they failed to do so, and it accused the boys of inviting and actually instigating the sexual abuse.

120.   In response to a lawsuit alleging sexual abuse and assaults similar to those described here, Indian Mountain School blamed the child victim, arguing that: "Any injuries, losses and damages claimed by the plaintiff ...  were caused by the plaintiff's own negligence...."

121.   As a result of Indian Mountain School's acts and omissions, Ramsay's ability to engage in normal life activities has been permanently impaired and he has been and will be unable to lead and enjoy a normal life.

122.   The harm inflicted on Ramsay at Indian Mountain School has severely interfered with his ability to engage in lasting meaningful relationships.

123.   Ramsay's ability to maintain intimate physical, sexual and emotional relationships has been irreparably damaged.

124.   Ramsay has sustained physical pain and suffering.

125.    Ramsay has sustained, and will continue over the course of his lifetime to suffer, mental and emotional injuries, some or all of which are permanent, including severe emotional distress, feelings of abandonment, humiliation, embarrassment, pain and anguish, anxiety, panic, sexual dysfunction, depression, hyper-vigilance, lack of ability to trust, shame, low self-esteem, self-loathing, intensely disturbing nightmares, and suicidal ideation.

126.    Since his time at Indian Mountain School and to this day, Ramsay fears that Simonds may have photographed him naked and engaged in sex acts alone and/or with other boys, and that these pornographic photographs of him have been or will be published on kiddie porn sites on the internet and distributed to pedophiles throughout the world.

127.    If the school and its administrators, faculty, staff, and Board had acted responsibly to report and discipline Simonds in the Spring of 1985 when the school finally decided to terminate Simonds' employment, or earlier when his abuse was known or suspected, any and all photographs that Simonds had taken of Ramsay would more likely than not have been confiscated by the school or by law enforcement, they would have been destroyed, and they would not have remained in Simonds' possession for him to use, distribute and publicize for the rest of his life.

128.    The school's negligence and its reckless and irresponsible misconduct even after Ramsay left the school in 1980, and to this day, caused and continues to

cause him harm because of the fear of such publication and for the reasons alleged elsewhere herein.

129.    Ramsay has also suffered, and will continue to suffer, out-of-pocket economic damages for mental health therapy and other costs of care.

130.    Ramsay's injuries and damages were caused by the negligence of Indian Mountain School, its Board of Trustees, teachers, administrators, employees and agents, for whose negligence the school is liable, in the ways previously described and in the following ways:

> a.   The school employed a known pedophile, and allowed that pedophile free reign to gratify his perverse sexual desires by molesting young vulnerable boys in the school's care and custody, including Ramsay Gourd;
>
> b.   The school failed and refused to supervise, discipline, report or fire a school teacher whom it knew and should have known was a serial child molester; and
>
> c.   The school failed to warn Ramsay and his mother of the risk of harm and of the actual harm to which he was subjected while attending Indian Mountain School.

131.    Indian Mountain School owed Ramsay a duty of care, it breached that duty, its breach caused Ramsay to be repeatedly sexually assaulted, abused, exploited and molested, and Ramsay suffered damages as a result.

**THE DEFENDANT'S FRAUDULENT CONCEALMENT**

132.   Indian Mountain School fraudulently concealed from Ramsay, and continues to attempt to fraudulently conceal from him, the existence of the causes of action set forth in this complaint.

133.   The defendant is, and has for years been, actually aware of the facts necessary to establish plaintiff's causes of action.

134.   The defendant, acting through its agents and employees, intentionally concealed these facts from the plaintiff in the ways described in this complaint and in the following additional ways and circumstances, among others:

a.      By failing to report Christopher Simonds to DCYS and law enforcement as mandated by Connecticut law;

b.      By allowing Simonds to quietly resign from IMS in June 1985 without disclosing to anyone that he was found to have sexually abused a student;

c.      By intentionally making an inaccurate report to DCYS in June 1985 for the purpose of covering up the nature and extent of Simonds' sexual abuse of boys and its knowledge of and complicity in Simonds' abuse;

d.      By obstructing, and by failing and refusing to cooperate with, a 1992 Connecticut State Police investigation into Simonds' sexual abuse of IMS students;

24

e.      By intentionally destroying Simonds' personnel file and other records documenting his sexual abuse of boys, and complaints and reports of that sexual abuse, for the purpose of keeping that file from the Connecticut State Police, the public, and victims and their attorneys;

f.      By taking and/or supporting legal action to keep the Connecticut State Police Investigation report secret;

g.      By falsely denying to the Hartford Courant in July 1995 that the School failed to cooperate with the 1992 State Police investigation and by calling the allegations of Simonds' child sexual abuse at IMS "ludicrous".

h.      By seeking protective orders and by redacting information from documents produced by the school in litigation for the purpose of hiding the nature and extent of Simonds' sexual abuse of students and the school's knowledge of and complicity in Simonds' abuse, and thus keeping from the victims the information necessary for them to bring suit against the school;

i.      By destroying documents produced in litigation concerning the nature and extent of Simonds' sexual abuse of students and the school's knowledge of and complicity in Simonds' abuse;

j.      By violating a March 30, 1994 Connecticut Superior Court Order requiring the school to maintain documents produced in litigation concerning the nature and extent of Simonds' sexual abuse of students and the school's knowledge of and complicity in Simonds' abuse;

k.      By endorsing confidentiality agreements prohibiting the school and its lawyers from "inform[ing] others of the fact that the [victims were] abused by Christopher Simonds while … at IMS, that [victims] brought …claim[s] against IMS as a result, or that the Parties… settled claims stemming from that abuse";

l.      By insisting on and endorsing confidentiality agreements prohibiting victims of Simonds' abuse and their attorneys from revealing information about lawsuit settlements, information learned in discovery, sexual abuse at the school, and the school's culpability;

m.      By threatening to sue victims for monetary damages if they violated confidentiality agreements;

n.      By falsely stating to a journalist from the Hartford Courant in August 1993 that it did not even know whether Simonds quit his employment at the school, was fired or was asked to resign;

o.      By sending an April 26, 1993 letter to IMS parents describing publicized accounts of Simonds' molestation of IMS students as "unfounded suggestions and rumors", when the school knew and knows that such accounts were accurate and substantiated;

p.      By hiring a public relations firm in the wake of news reports in 1993 about sexual abuse at the school in order to craft self-serving and

intentionally false answers to reporters' questions about the school's knowledge and culpability.

       q.      By stating to the Hartford Courant in 1997, when asked about the impending trial of a sexual abuse suit brought against the school by a former IMS student, that it denied any liability or responsibility for Simonds' abuse of IMS students.

       r.      By failing and refusing to disclose the findings and conclusions of a so-called "thorough" and "complete" investigation into the sexual abuse of boys at IMS conducted by "independent legal counsel" retained by the school in 2014;

       s.      By falsely stating in a 2014 letters to the IMS community and alumni that its so-called "thorough" and "complete" investigation into the sexual abuse of boys at IMS was being conducted by "independent legal counsel", when, in fact, the law firm conducting the investigation was retained by the IMS Board of Trustees in anticipation of sex abuse litigation and to advise IMS about how to respond to and defend ongoing and future sex abuse lawsuits.

       t.      By stating in a 2014 letter to the IMS community that boys "might have been abused", when the school knew and knows that many boys have, in fact, been abused;

u.      By characterizing, in a 2014 letter the IMS community, the many complaints of sexual abuse at IMS as "allegations", when the school knew and knows that those complaints had, in fact, been substantiated;

v.      By publicly proclaiming, in federal court pleadings in 2015, "the school's lack of negligence or other form of liability" and the school's "lack of knowledge or notice regarding the alleged inappropriate conduct of Christopher Simonds".

w.      By publicly denying, including in legal pleadings filed as recently as 2016, that the school knew and should have known of the risk of Simonds' sexual abuse of IMS boys prior to his termination in 1985, when, in fact, the school was on actual and constructive notice years before that date.

x.      By publicly denying, including in legal pleadings filed as recently as 2016, that the school failed and refused to protect students from the risk of Simonds' sexual abuse, when, in fact, the school provided no such protection at any time.

y.      By publicly denying, including in legal pleadings filed as recently as 2016, that the school failed and refused to warn students and their families of the risk of sexual abuse by Simonds, when, in fact, the school provided no such warning at any time.

z.      By stating under oath in December 2015 that the school did not even know if Simonds abused a single child, when it knew that he had sexually assaulted, molested and abused many children.

aa.     By denying in December 2015 that Simonds gave cigarettes or alcohol or drugs to any child at any time, when it knew that he had done this to many children for years.

bb.     By engaging in what at least one IMS Trustee called an "ill-advised, illegal and potentially dangerous cover-up" of Simonds' sexual abuse at the school.

135.   The defendant concealed the facts necessary to establish plaintiff's causes of action for the purpose of obtaining delay on plaintiff's part in filing a complaint.

136.   Due to the defendant's fraudulent concealment, the plaintiff's mother was unaware of the facts necessary to establish the plaintiff's causes of action during the time that the plaintiff was a minor (and during the entirety of her life), and plaintiff was unaware of the facts necessary to establish his causes of action until January 2017.

137.   In January 2017, the plaintiff met with legal counsel and learned for the first time the facts necessary to establish his causes of action – namely, the facts alleged herein concerning the defendant's failure and refusal to warn and protect him from Christopher Simonds' sexual abuse after the school knew and should have known of Simonds' possession of child pornography, Simonds' inappropriate behavior

with boys, Simonds' sexual interest in boys, and Simonds' sexual abuse, exploitation and manipulation of boys – all of which was known to the school prior to and during Simonds' abuse of the plaintiff.

138.    This Complaint is timely filed pursuant to Conn. Gen. Stat. § 52-595.

**THE DEFENDANT'S CONTINUING COURSE OF CONDUCT, CONTINUING FAILURE TO HELP THE PLAINTIFF RECEIVE EFFECTIVE TREATMENT AND COUNSELING, AND CONTINUING BREACH OF DUTY**

139.    The defendant committed the wrongs upon the plaintiff enumerated in this complaint.

140.    The defendant knew, should have known (through investigation if necessary), and had reason to know that Simonds sexually abused, molested and exploited the plaintiff and many other children, that the plaintiff and these other victims suffered physical and mental injuries and damages from the abuse, and that the plaintiff and the victims required meaningful and adequate mental health treatment and counseling for those injuries and damages.

141.    The defendant knew, should have known and had reason to know that such treatment and counseling would be more effective, more likely to result in positive therapeutic outcomes, and more likely to reduce the plaintiff's decades of self-blame and suffering if the school revealed the truth about the extent and nature of Simonds' abuse of IMS students and the school's knowledge of, and failure to warn and protect the plaintiff from, such abuse.

142.   The defendant knew and should have known that its failure to investigate and to identify Ramsay as one of Simonds' victims (if it did not already know this) and its failure and refusal to reveal the truth about the extent and nature of Simonds' abuse of IMS students, and the school's knowledge of and culpability in that abuse, would prevent Ramsay from receiving adequate treatment and counseling, thereby compounding and exacerbating his injuries.

143.   As admitted by IMS psychiatrist Sandy Mirabile in his May 24, 1985 letter to Headmaster Peter Carleton, in regards to students who were or might have been abused by Simonds, "the very worst thing that could happen is that cause be given for someone to say that you or anyone else was trying to sweep something under the rug at the expense of the students."

144.   The plaintiff reasonably expected that the defendant would reveal what it knew about Simonds' abuse and about the school's failures to stop and to warn about the abuse.

145.   The defendant owed a continuing duty to the plaintiff to inform him of the truth and to take all other steps within its power to assist the plaintiff with his recovery and treatment, and to reduce the plaintiff's pain and suffering; in December 2015, the school admitted under oath that it had the responsibility to make sure Simonds' abuse of children was investigated and victims identified so the school could reach out to help them.

146.    In October 16 and October 27, 2014 letters to IMS alumni, the defendant stated: "[w]e reaffirm our pledge to protecting the health, safety, and well-being of our students past and present"; "we are committed to our alumni from decades ago"; and it would "support any alumni who may have been harmed".

147.    The defendant continually breached that duty, and continues to breach that duty to the present time.

148.    This complaint is timely filed under the Connecticut common law continuing course of conduct and continuing treatment doctrines.

## IV.    Second Claim for Relief (Recklessness):

1.      Paragraphs 1 through 148 are hereby incorporated as Paragraph 1 of this Second Claim for Relief, as if fully set forth herein.

2.      Indian Mountain School, acting through its administrators, teachers and staff, was consciously aware of the fact that it created a substantial risk to Ramsay.

3.      Notwithstanding the school's conscious awareness of the risk to Ramsay, the school failed to take necessary and appropriate steps to reduce or eliminate the risk.

4.      Notwithstanding the school's conscious awareness of the risk to Ramsay, the school took affirmative steps to exacerbate the risk and to make harm and injury to Ramsay more likely.

5.      The injuries suffered by Ramsay were caused by the reckless or callous

indifference, or the wanton misconduct, of the defendant.

**V.     Third Claim for Relief (Negligent Infliction of Emotional Distress):**

1.     Paragraphs 1 through 148 are hereby incorporated as Paragraph 1 of this Third Claim for Relief, as if fully set forth herein.

2.     Indian Mountain School created an unreasonable risk of causing Ramsay emotional distress.

3.     Ramsay suffered distress, and his distress was foreseeable.

4.     The emotional distress was severe enough that it might result in illness or bodily harm.

5.     The school's conduct was the cause of Ramsay's distress.

**VI.**   **PRAYER FOR RELIEF**

Wherefore, the plaintiff prays for the following relief:

1. Compensatory damages;

2. Punitive damages; and

3. Such other relief as the Court deems just and proper.


PLAINTIFF RAMSAY GOURD


BY s/Antonio Ponvert III
ANTONIO PONVERT III ct17516
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
Tel: 203-336-4421
(203)368-3244 (facsimile)
aponvert@koskoff.com

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RAMSAY GOURD | : | CIVIL ACTION NO. |
| | : | 18cv0582 (JBA) |
| Plaintiff, | : | |
| V. | : | |
| | : | |
| INDIAN MOUNTAIN SCHOOL, INC., | : | |
| | : | |
| Defendant. | : | APRIL 30, 2019 |

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the plaintiff demands a trial by jury on all issues.

THE PLAINTIFF

By /s/ Antonio Ponvert III
Antonio Ponvert III
Federal Bar No. ct 17516
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, Connecticut 06604
TEL:  203-336-4421
FAX: 203-368-3244
Email: aponvert@koskoff.com