UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAMSAY R. GOURD,<br>    *Plaintiff*,<br>v.<br>INDIAN MOUNTAIN SCHOOL, INC.,<br>    *Defendant*. | Civil No. 3:18-cv-582 (JBA)<br><br>March 16, 2020 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ramsey R. Gourd brings this diversity action against Defendant Indian Mountain School, seeking damages for alleged sexual abuse that he suffered while enrolled there as a boarding student from 1977 to 1980. Defendant contends that this action is untimely, and so moves for summary judgment on Plaintiff's various Connecticut tort claims. For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

**I. Background**

**A. Plaintiff's Experience**

Plaintiff Ramsay R. Gourd was born in 1965. (*See* Parties' L.R. Stmts. [Docs. ## 76, 92] ¶ 1.) In September 1977, when he was 12 years old, Plaintiff enrolled at Indian Mountain School ("IMS") as a boarding student. (*See id.* ¶¶ 2, 9; Am. Compl. [Doc. # 70] ¶ 6.) Plaintiff attended IMS until he was 15 years old, leaving the school in June 1980. (*See* Parties' L.R. Stmts. ¶ 2; Am. Compl. ¶ 6.)

Plaintiff alleges that IMS teacher Christopher Simonds sexually abused him during his time at the school. (Parties' L.R. Stmts. ¶ 3.) While still a student, Plaintiff once attempted to tell another IMS teacher about Mr. Simonds's actions. (*Id.* ¶ 4.) Plaintiff understood at the time that

the faculty "were adults and [he] was in their care." (Ex. 1 (Ramsay Gourd 2018 Dep.) to Dion Aff. [Doc. # 64-1] at 13.)

Plaintiff has not repressed the memory of the alleged sexual abuse. (Parties' L.R. Stmts. ¶ 5.) Plaintiff has been able to recall the alleged abuse since it occurred, and he has discussed the alleged abuse with various individuals since reaching adulthood. (*Id.*)

The first of these adult disclosures occurred in 1990, after Plaintiff moved to Boston subsequent to his college graduation. (*Id.* ¶¶ 8, 9.) That year, Plaintiff began a relationship with his future wife, Mary Jo Gourd, and he told her on their second date "that he had been sexually abused while in boarding school." (*Id.* ¶ 9.) Plaintiff also disclosed the alleged abuse to John Truslow, a friend and former IMS student, around this same time period. (*Id.* ¶ 10.)

In or around 1997, the Gourd marital household received a letter from IMS that "had to do with Christopher Simonds," and Plaintiff's wife's response was to say, "Ramsay . . . , [n]ow's your time to speak up." (Ex. 2 (Mary Jo Gourd Dep.) to Dion Aff. [Doc. # 64-2] at 52.) Mrs. Gourd recalled that Plaintiff stated, "When my mom is alive, I can't speak up about my abuse" because "it would kill her." (*Id.* at 53.)[1] For his part, Plaintiff "recalled that the contents of the letter 'validated that, in fact, I was abused' and 'that was enough for me at the time.'" (Parties L.R. Stmts. ¶ 14.)

Around that same time period, in or around 1996 or 1997, Plaintiff's brother, Jeremiah Gourd, considered enrolling his son at IMS. (*Id.* ¶¶ 16, 17.) Plaintiff tried to dissuade his brother from doing so, because "[Plaintiff] knew that there was public knowledge that there had been a scandal there." (Ex. 7 (Ramsay Gourd 2017 Dep.) to Dion Aff. [Doc. # 64-1] at 65; *see also*

---

[1] Plaintiff's mother died on January 7, 2000. (Ex. 4 (Pl.'s Resp. to Interrog.) to Dion Aff. [Doc. # 64-4] at 10.)

2

Parties' L.R. Stmts. ¶ 17.) Plaintiff also did not "know if Simonds was there [at IMS] or not at the time, which is why [he] made the comment to [his] brother." (Ramsay Gourd 2018 Dep. at 27.)

The record also indicates that Plaintiff contacted IMS's attorney, Mark Altermatt, sometime after Jeremiah Gourd enrolled his son at the school. (*See* Ex. U (Undated Altermatt Notes) to Ponvert Aff. [Doc. # 75-2] at 1.) According to Mr. Altermatt's notes, Plaintiff expressed that he had "favorable feelings towards the school" and "sa[id] he has no interest in suing." (*Id.*)

Sometime between 2003 and 2005, Plaintiff "told his best friend David Bryan that he had been abused as a child while enrolled at IMS." (Parties' L.R. Stmts. ¶ 23.) Plaintiff explained to Mr. Bryan "that the abuse occurred in the School's basement," "that drugs were used as a 'carrot[,]'" and "that 'there were other kids that were impacted.'" (*Id.* ¶¶ 24, 25.) Mr. Bryan responded, "Well, you know, aren't you going to do something?," to which Plaintiff replied "that he 'couldn't face it.'" (*Id.* ¶ 26.)

Between 2005 and 2006, Plaintiff also told Mr. Bryan's wife, Brenda, of the alleged abuse. (*Id.* ¶ 27.) She testified that Plaintiff "revealed to her that the abuse had occurred when he was in sixth or seventh grade and that there were 'other boys who had also been abused.'" (*Id.* ¶ 28.) She recalled "having a discussion with Plaintiff about 'what could be done at this point.'" (*Id.* ¶ 29.)

On March 25, 2009, Plaintiff sent an e-mail with the subject "Doe Vs. Indian Mountain School" to Susan Smith, an attorney "who had represented other former students in actions against [IMS] involving claims of sexual abuse by Simonds." (*Id.* ¶ 32; *see* Ex. 10 (Gourd 2009 E-mails) to Dion Aff. [Doc. # 64-10] at 1.) Plaintiff wrote to Ms. Smith:

> I am a former student of Indian Mountain School, (1978-1981). While I was approached to participate in the legal actions taken against IMS, I was not in a state to do so at the time. While I still believe that legal action is not the course for

3

me, I am interested in learning the outcome of the case, where Christopher Simonds currently resides, and if there is a support network of former students.

Any information you could pass on would be greatly appreciated. And thank you for your advocacy. Yours is an important and heartbreaking job.

(Gourd 2009 E-mails at 1.)

On April 8, 2009, Plaintiff "had a conversation with the attorney who represented five victims from IMS." (*Id.* at 3.) Plaintiff informed two friends, Lou Midura and Leonard Stephens, of this conversation regarding his "trauma," noting that "[the attorney] really didn't tell me much more than I already knew" and that "[e]ssentially, [Mr. Simonds] got a slap on the wrist and was relocated to NY state." (*Id.*) Plaintiff also informed his friends that he had "decided to contact his abuser, Christopher Simonds, with the hope of gaining closure and peace related to his experiences." (Parties' L.R. Stmts. ¶ 31; *see also* Gourd 2009 E-mails at 3.) That same year, Plaintiff also told his brother Henri Gourd that an IMS teacher had abused him. (Parties' L.R. Stmts. ¶ 34.)

Prior to 2013, Plaintiff was "aware that people could bring lawsuits against institutions involving people that had worked there and abused kids" and was "aware of lawsuits involving the Catholic church." (Ramsay Gourd 2018 Dep. at 110.) Plaintiff has testified that his "understanding of the . . . difference" from the situation with IMS "was that the Roman Catholic church knew what was going on" and that he "didn't believe that Indian Mountain knew." (*Id.*)

On October 27, 2014, Plaintiff was among the intended recipients of a message from IMS regarding the "allegations brought forth by alumni who attended the school in the 1970s and '80s." (Ex. RR (IMS Message) to Ponvert Aff. [Doc. # 75-3] at 1.) The message relayed that the "Board of Trustees has retained independent legal counsel to conduct a complete investigation

4

and to report back to the Board regarding what happened, and how best to respect and support any alumni who may have been harmed." (*Id.*) The message also stated that IMS "hope[d] to hear directly from any alumni affected by these allegations . . . and to offer any other direct support you may need." (*Id.*) The School's headmaster also wrote a similar letter to the IMS community that same day, stating that the School "reaffirm[s] [its] pledge to protecting the health, safety, and well-being of [its] students past and present." (Ex. QQ (Headmaster Message) to Ponvert Aff. [Doc. # 75-3] at 1.)

On December 9, 2014, Plaintiff e-mailed all three of his brothers about "Chris Simonds, the perpetrator of [his] childhood abuse." (Ex. 12 (Gourd 2014 E-mail) to Dion Aff. [Doc. # 64-12] at 1.) Plaintiff shared a link to a 2014 article published in *The Hartford Courant*, which reported that a "former student at the Indian Mountain boarding school in Salisbury has filed a federal lawsuit alleging that the school's former headmaster ordered him to live in the basement of his home so that he could sexually assault him at will in the 1980s." (*Id.* at 2.) The article also summarized its earlier coverage of IMS, stating that "[i]n 1996, The Courant exposed a string of sexual abuse allegations against Christopher Simonds, a teacher at the school. The allegations against Simonds surfaced after the criminal statute of limitations had expired, and he was never charged." (*Id.*) The article notes that five lawsuits alleging abuse at IMS had been "settled out of court." (*Id.* at 3.)

In 2017, Plaintiff received a letter from Antonio Ponvert III, who now represents him in this matter, that was sent to IMS alumni who may have "information about sexual abuse occurring at the school." (Ex. 13 (Ponvert Letter) to Dion Aff. [Doc. # 64-13] at 1.) Plaintiff met with Mr. Ponvert and now represents that he learned, among other things, that "IMS administrators, faculty and staff knew that Simonds had and continued every year to have

5

inappropriately close relationships" with students. (Ex. B (Gourd Aff.) to Ponvert Aff. [Doc. # 75-1] at 1.)

On April 6, 2018, Plaintiff brought this action, claiming that IMS is liable for negligence, recklessness, and negligent infliction of emotional distress. Plaintiff was fifty-three years old at the time of filing. (*See* Parties' L.R. Stmts. ¶ 1.) He asserts that he was "ignorant of the facts necessary to establish his causes of action within the limitations period" and that he "did not discover, and in the exercise of reasonable case [c]ould not have discovered, sufficient facts to bring a cause of action against the school." (Pl.'s L.R. Stmt. [Doc. # 76] Additional Material Facts ¶¶ 1, 2.)

### B. Other Litigation Against IMS

IMS has also been a defendant to other sexual abuse lawsuits brought by former students.

In 1993, three former IMS students filed a lawsuit in Connecticut superior court alleging that Mr. Simonds "sexually abused, assaulted, and exploited numerous IMS students" and that "there [we]re forty two (42) known victims." *Longley v. Indian Mountain Sch., Inc.*, No. CV 93-0063378, 1994 WL 395269, at *1 (Conn. Super. Ct. July 25, 1994).[2] This lawsuit received coverage in the *New York Times*, in an article headlined "School Sued on Sex Abuse." (Ex. 19 (1993 N.Y. Times Article) to Dion Aff. [Doc. # 64-16] at 1.) The *Hartford Courant* also ran a story about the lawsuit, quoting the *Longley* plaintiffs' counsel as commenting that "the school's administrators knew, or should have known, that sexual misconduct was occurring" and that they "were negligent in not firing Simonds." (Ex. 17 (1993 Courant Article) to Dion Aff. [Doc. # 64-17] at 1.)

---

[2] Docket sheets are public records of which a court may take judicial notice, *see Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006), not for the truth of the matters asserted, but "to establish the fact of such litigation and related filings," *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

The Connecticut newspaper *Register Citizen* also interviewed a former IMS Board of Trustees President, Paul Levin, about the litigation, and reported that Mr. Levin was "pleased the story is coming to light[,] . . . 'thinks the lawsuits will draw out unbelievable numbers of others who have been abused[,]" and "believes the coverup may be over." (Ex. 18 (1993 Register Citizen Article) to Dion Aff. [Doc. # 64-18] at 1-2.)

That same year, another student, proceeding pseudonymously, brought a diversity action in the District of Connecticut against IMS, Mr. Simonds, and other school officials. *Doe v. Indian Mountain Sch., Inc.*, No. 93-cv-1611 (RNC) (D. Conn. filed Aug. 13, 1993). Attorney Susan Smith was lead counsel on that case. *See id.* The lawsuit received coverage in the *Hartford Advocate*, which reported that "there are allegations of an administrative conspiracy to cover up the initial sexual [abuse] allegation which resulted in Simonds' resignation." (Ex. 20 (1993 Hartford Advocate Article) to Dion Aff. [Doc. # 64-20] at 2.) The *Hartford Courant* also discussed this lawsuit—as well as a "state police investigation in 1992 and 1993 [that] corroborated many of the claims"—in an editorial headlined, "A School's Conspiracy of Silence." (Ex. 26 (1995 Hartford Courant Editorial) to Dion Aff. [Doc. # 64-26] at 1.) This federal case ultimately settled in 1997. *See id.*, ECF No. 137.

In 1994, a similar lawsuit was filed against IMS in state court. *See Roe v. Indian Mountain Sch., Inc.*, No. CV 94-0066132-S (Conn. Super. Ct. filed 1994). The *Hartford Courant* reported on the lawsuit in an article headlined, "Sex Abuse Lawsuit Heads to Court Date; Salisbury School Named." (Ex. 29 (1997 Hartford Courant Article) to Dion Aff. [Doc. # 64-29] at 1.) The *Courant* reported that, in 1977, several staff members and an assistant administrator told the headmaster that "they believed Simonds was behaving inappropriately with students." (*Id.* at 2.) The *Courant* also reported that, in 1985, another former student complained about Simonds to the IMS Board

of Trustees. (*Id.*) Mr. Levin, the board's chair, "said [that] trustees tried to keep . . . [the] complaint quiet" and that he expected to testify "about the alleged attempt at a coverup." (*Id.*)

Similar lawsuits against IMS were filed in the years that followed. On October 19, 2018, IMS sent a letter to "Members of the Indian Mountain School Community," announcing that it had settled "17 claims from former students relating to sexual abuse by Simonds." (Ex. W (2018 IMS Letter) to Ponvert Aff. [Doc. # 75-1] at 1.) This letter also addressed the finding of its internal investigation and "offer[ed] a sincere apology to survivors of abuse," with hope that such an apology would "provide some opportunity for healing to members of our community." (*Id.* at 1, 3.)

## II. Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

III. Discussion

At the time Plaintiff brought this action in 2018, Connecticut law required that "no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of majority." Conn. Gen. Stat. Ann. § 52-577d (2002).[3]

---

[3] Section 52-577d was subsequently amended in 2019 to provide that no such action "may be brought by such person later than thirty years from the date such person attains the age of twenty-one"—that is to say, once that person turns fifty-one years old. As the Court notes above, Plaintiff was fifty-three years old when he filed this lawsuit. Because Plaintiff's lawsuit falls outside of the limitations period under either version of the statute, the Court need not determine whether the 2019 amendment has a prospective or retroactive effect.

9

Under this statute of limitations, Plaintiff was required to bring his tort claims by 2013, when he reached the age of 48. Thus, unless the limitations period is tolled, Plaintiff's claims of negligence, recklessness, and negligent infliction of emotional distress are time-barred.

Plaintiff asserts two bases for tolling the statute of limitations. He contends that the statute of limitations should be tolled under the doctrine of fraudulent concealment. (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 74] at 3.) In the alternative, Plaintiff contends that the statute of limitations should be tolled under the continuing course of conduct doctrine. (*Id.* at 31.) Defendant argues that neither doctrine applies and that Plaintiff's action is thus untimely. (*See* Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 91] at 10, 33.) The Court will consider these arguments in turn.

### A. Fraudulent Concealment

Under Connecticut law, "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." Conn. Gen. Stat. § 52-595. "When the plaintiff asserts that the limitations period has been tolled by an equitable exception to the statute of limitations, the burden normally shifts to the plaintiff to establish a disputed issue of material fact in avoidance of the statute." *Iacurci v. Sax*, 313 Conn. 786, 799 (2014) (internal quotation marks omitted).

A plaintiff's ignorance of the facts that the defendant has sought to conceal is "a necessary element of tolling." *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 427 (2d Cir. 1999).[4] As Connecticut courts have explained:

---

[4] Section 52-595 also requires a plaintiff to demonstrate that a defendant:

> Fraudulent concealment can exist only if the plaintiff lacked the requisite knowledge pertinent to its cause of action until the time that the applicable limitations period expired. Thus, a court will not toll the statute of limitations to the extent the plaintiff had actual knowledge of the defendant's wrongdoing and [his] own injury when they happened, and yet failed to file suit before the limitations period expired. Nor may the plaintiff rely on the doctrine of fraudulent concealment simply because [his] knowledge was somewhat delayed or incomplete. On the contrary, the statutory limitations period begins running as soon as the plaintiff has sufficient actual knowledge to be aware of its claim, even though [he] lacks some of the details of [his] cause of action and does not discover the full enormity of the defendant's wrongdoing until later.

*Maslak v. Maslak*, 2013 WL 5663798, at *5 (Conn. Super. Ct. Sept. 27, 2013) (emphasis omitted) (quoting *Holliday v. Ludgin*, 2009 WL 3838915, at *3 (Conn. Super. Ct. Oct. 16, 2009)); *accord Deutsche Bank v. Lichtenfels*, 2009 WL 2230937, at *23 (Conn. Super. Ct. June 17, 2009). The Connecticut Supreme Court has also clarified that the "injury"—or "actionable harm"—may "occur when the plaintiff has knowledge of facts that would put a reasonable person on notice of the nature and extent of an injury, and that the injury was caused by the negligent conduct of another," and that "the harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run." *Lagassey v. State*, 268 Conn. 723, 749 (2004); *see also Hodges v. Glenholme Sch.*, No. 3:15-CV-1161 (SRU), 2016 WL 4792184, at *7 (D. Conn. Sept. 13, 2016), *aff'd*, 713 F. App'x 49 (2d Cir. 2017) ("A plaintiff need not have an understanding of the full extent of her harm, nor its legal import, in order to have sufficient knowledge to bring a claim.").

---

(1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) intentionally concealed these facts from the plaintiff; and (3) concealed the facts for the purpose of obtaining delay on the plaintiff's part in filing a complaint on their cause of action.

*Iacurci*, 313 Conn. at 799–800 (alterations omitted).

Defendant contends that Plaintiff cannot establish "he was ignorant of the facts sufficient to file a claim against IMS," (Def.'s Mem. at 19), because he has admitted "that he has always known that (1) he was abused by Simonds, (2) he suffered multiple injuries as a result of the abuse, (3) the abuse occurred while he was under the School's care and protection, and (4) Simonds was employed by IMS." (*Id.* at 13-14.) Defendant also notes that Plaintiff has a "long history of disclosing that he had been abused," telling "at least eight different people before the statute of limitations expired that he had been abused, including . . . Susan Smith, an attorney who asserted claims against IMS on behalf of several former student alleging abuse by Simonds." (*Id.* at 14-15.)

Plaintiff responds that "the contention that Ramsay knew that 'the abuse occurred while he was under the school's care and protection' is not supported by the record." (Pl.'s Opp. at 4 n.2. (quoting Def.'s Mem. at 13-14.)) Plaintiff contends that the fact that "prior to January 2017, Ramsay heard 'there had been some claims' and that 'others had filed suit against the school about what Chris Simonds had done' . . . is meaningless unless he also learned, within the limitations period, that the claims and suits had revealed or were based on the school's complicity in Simonds' abuse." (*Id.* (citing Def.'s Mem. at 7 n.6).)

Here, Plaintiff brings a claim of negligence, alleging that Defendant "employed a known pedophile," "failed and refused to supervise, discipline, report or fire a school teacher whom it knew and should have known was a serial child molester," and "failed to warn Ramsay and his mother of the risk of harm and of the actual harm to which he was subjected while attending Indian Mountain School." (Am. Compl. ¶ 130.) Plaintiff also brings claims of recklessness and negligent infliction of emotional distress premised on the same injuries. (*See id.* §§ IV, V.) In essence, the "actionable harm" in this case is that Plaintiff was allegedly sexually abused by an

IMS teacher while in the School's care, and the School's "negligent conduct" is that it allegedly created the circumstances for his abuse, did not warn him or his mother of the potential for abuse, and did not protect him from this abuse or intervene to stop this abuse.

As to the actionable harm, it is undisputed that Plaintiff knew prior to 2013 that Mr. Simonds subjected him to the alleged abuse and that Plaintiff disclosed this abuse to multiple individuals prior to 2013. (*See* Parties' L.R. Stmts. ¶¶ 4, 8-10, 23-29, 31, 34.) It is also undisputed that Plaintiff had knowledge prior to 2013 that he "was in [Defendant's] care" while enrolled as a student, (Ramsay Gourd 2018 Dep. at 13), and that he was "aware that people could bring lawsuits against institutions involving people that had worked there and abused kids" and was "aware of lawsuits involving the Catholic church," (*id.* at 110). Although Plaintiff may not have been aware of the School's full complicity in his alleged abuse, he certainly had enough knowledge to bring a claim. *See Rosenfield v. I. David Marder & Assocs., LLC*, 110 Conn. App. 679, 686 (2008) ("[T]he occurrence of an act or omission . . . that causes a direct injury, however slight, may start the statute of limitations running against the right to maintain an action even if the plaintiff is not aware of the injury, and even if all resulting damages have not yet occurred; it is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case, it is unimportant that the actual or substantial damage is not discovered or does not occur until later. The fact that the extent of the damages cannot be determined at the time of the wrongful act does not postpone the running of the statute of limitations." (quoting 51 Am. Jur. 2d 548–49, Limitation of Actions § 151 (2000)).[5]

---

[5] Plaintiff contends that the "only conceivable cause of action supported by the 'four facts' identified by the [D]efendant is one for *respondeat superior*, a claim not asserted in the Complaint," and that he otherwise did not know all of the facts necessary to assert his claims.

13

As in *Dignan v. McGee*, Plaintiff was "[n]ot only . . . aware of the abuse, but he was clearly aware of his ability to bring a lawsuit against the defendant," as demonstrated by e-mails that Plaintiff wrote in 2009. 2009 WL 973495, at *5. On March 25, 2009, Plaintiff sent Attorney Susan Smith an e-mail headed "Doe Vs. Indian Mountain School," in which he wrote that he "was approached to participate in the legal actions taken against IMS, [but] was not in a state to do so at the time" and that he "still believe[d] that legal action is not the course for [him]." (Gourd 2009 E-mails at 1.) The e-mail to Attorney Susan Smith makes a specific reference to alleged abuser Christopher Simonds, and, in the same sentence, requests information about "a support network of former students." (*Id.*) Additionally, on April 8, 2009, Plaintiff documented in his e-mail to Lou Midura and Leonard Stephens that he "had a conversation with the attorney who represented five victims from IMS." (*Id.* at 3.) Even making all reasonable inferences in Plaintiff's favor, the Court can only conclude from these e-mails that Plaintiff had at least some knowledge that a former student could sue IMS for sexual abuse allegedly perpetrated by Mr. Simonds.

---

(Pl.'s Opp. at 4.) But as other courts have held, a plaintiff has sufficient information to file a tort claim if he knows that he was abused and that this abuse occurred under a defendant's supervision. *See Dennany v. Knights of Columbus*, No. 3:10-CV-1961 (SRU), 2011 WL 3490039, at *6 (D. Conn. Aug. 10, 2011) ("[S]ince 1979, [plaintiff] has known that [the perpetrator] abused him, that [the perpetrator] was associated with Knights and was trusted with supervising members of [a Knights youth organization], and that Knights owed [plaintiff] a fiduciary duty. The sum of those facts was sufficient for [plaintiff] to file his negligence claim [against the Knights], based on information and belief, when he turned 18 and his injury accrued."); *Hodges*, 2016 WL 4792184, at *7 (dismissing complaint as untimely where plaintiff "fail[ed] to adequately allege her own lack of knowledge of the abuse" while a student at defendant-school); *see also Dignan v. McGee*, No. 3:07-CV-1307 (JCH), 2009 WL 973495, at *5 (D. Conn. Apr. 9, 2009) (granting summary judgment where plaintiff had unambiguously demonstrated his knowledge that he had been abused).

Plaintiff's efforts to liken this case to *Horner v. Hartford Roman Catholic Diocesan Corporation* are unavailing. In that case, the Connecticut Superior Court concluded that plaintiff was ignorant of his cause of action because plaintiff "testified that notwithstanding this awareness [of his abuse], he did not think he 'had any kind of recourse' against the diocese, specifically that he had 'no idea that the Archdiocese would be responsible for actions'" perpetrated by his abuser and because plaintiff "aver[red] that he was unaware of the possibility of holding the diocese responsible for the sexual abuse . . . until he was told about the 1970 report in May 2016 and realized that the diocese knew that [his abuser] was a child molester" before his abuser harmed him. *Horner v. Hartford Roman Catholic Diocesan Corp.*, No. X10CV176034898S, 2018 WL 5797810, at *4 (Conn. Super. Ct. Oct. 24, 2018). Plaintiff contends that "[t]his case is on all fours with *Horner*," as Plaintiff has averred that he "[u]ntil he met with [his] counsel in 2017, [he] had no idea that, prior to his attendance at the school, IMS knew Simonds possessed child pornography and was considered a likely pedophile," (Pl.'s Opp. at 6 (generally citing Gourd Aff.)), and has further testified that "prior to 2013, [he] was not aware of any claims that the school was culpable for what Mr. Simonds did to the kids at the school" and "didn't believe that IMS knew that Simonds was abusing [him]." (*Id.* at 7 (quoting Ramsay Gourd 2018 Dep. at 34, 110)). But *Horner* is distinct insofar as the plaintiff in that case alleged that the defendant owed him a fiduciary duty. *See Horner*, 2018 WL 5797810, at *2. And as Defendant notes, "the plaintiff in *Horner* did not believe that the diocese could be responsible for his harm and did not communicate with an attorney until after the expiration of the limitations period." (Def.'s Reply [Doc. # 80] at 5 (citing *Horner*, 2018 WL 5797810, at *2, *4 n.7).) Here, Plaintiff explicitly stated that he was "approached to participate in the legal actions taken against IMS" within the

limitations period but declined to do so. (Gourd 2009 E-mails at 1.)[6] Thus there is no genuine issue of material fact that Plaintiff timely knew that he had a potential cause of action against Defendant.

Because it is undisputed that Plaintiff was aware that he had a potential cause of action against Defendant, Plaintiff cannot, as a matter of law, rely on the fraudulent concealment doctrine to toll the timing of his claims.[7]

## B. Continuing Course of Conduct

The Connecticut Supreme Court has, "[i]n certain circumstances, . . . recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations. Tolling does not enlarge the period in which to sue that is imposed by a statute of limitations, but it

---

[6] Plaintiff attempts to minimize the import of his communications with Ms. Smith, suggesting that his comments about being "approached to participate in the legal actions taken against IMS" may "refer, not to a previous solicitation by Smith or another plaintiff's lawyer, but rather to [IMS] Attorney Altermatt's letter and phone call, where he appears to have asked Ramsay if he'd be willing to testify in one or more of the abuse cases on behalf of the school." (Pl.'s Opp. at 19 n.10.) But even if this were the correct interpretation of Plaintiff's 2009 e-mail, the statement would still indicate that he had direct knowledge that similarly situated former students were bringing sexual abuse claims against IMS.

[7] As a result, the Court need not reach Defendant's argument that, "[e]ven if Plaintiff could offer evidence that supported his claim that he did not know facts sufficient to file suit against IMS, that would still not be sufficient to avoid summary judgment on his fraudulent concealment claim," (Def.'s Mem. at 22), because he cannot prove that he "exercised reasonable diligence to discover the cause of action under the circumstances," *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 507 (D. Conn. 2007), in light of the fact that the news media widely reported on "allegations of an administrative conspiracy to cover up the initial sexual allegation which resulted in Simonds' resignation," (1993 Hartford Advocate Article at 2). Nor need the Court consider Defendant's related argument that the record cannot support a finding that IMS "intentionally concealed these facts from the plaintiff," *Iacurci*, 313 Conn. at 800 (alteration omitted), because the School "did not control the information allegedly concealed as these facts were widely and extensively covered by the media," (Def.'s Mem. at 31).

operates to suspend or interrupt its running while certain activity takes place." *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 311 (2014). This doctrine "reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Id.* at 312 (internal quotation marks omitted.)

However, "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm." *Rosato v. Mascardo*, 82 Conn. App. 396, 405 (2004). In the event that the plaintiff has not discovered the harm, a court must ask "whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Flannery*, 312 Conn. at 312. (internal quotation marks omitted). "In the absence of a continuing special relationship, there must be a subsequent wrongful act that is related to the prior negligence." *Id.* at 321 (internal quotation marks and alteration omitted).

In his Complaint, Plaintiff alleges that "defendant owed a continuing duty to the plaintiff to inform him of the truth and to take all other steps within its power to assist the plaintiff with his recovery and treatment, and to reduce the plaintiff's pain and suffering." (Am. Compl. ¶ 145.) Plaintiff asserts that the continuing course of conduct doctrine applies here because the school has "concede[d] a continuing course of conduct and continuing duty of care to its alumni who were sexually abused by Christopher Simonds while in the school's custody." (Pl.'s Opp. at 31.) In support of that contention, Plaintiff points to two messages sent by IMS officials in 2014, stating that IMS "reaffirm[s] [its] pledge to protecting the health, safety and well-being of our students past and present," (Headmaster Message at 1), and that IMS is "committed to [its] alumni from decades ago" and is seeking information as to "how best to respect and support any alumni who may have been harmed," (IMS Message at 1). Plaintiff also points to various

17

depositions with School officials, in which these officials express a commitment to helping alumni who had suffered abuse. (*See, e.g.*, Ex. V (IMS Chief Financial Officer Cheryl Sleboda Dep.) to Ponvert Aff. [Doc. # 75-2] at 97 (testifying that the school's "first priority is to protect the health, safety, and well-being of our students")*.*)

Defendant responds that "Plaintiff's knowledge of the factual predicate for his causes of action precludes tolling," because he "cannot establish that IMS owed him a duty that continued uninterrupted from 1980 until 2013." (Def.'s Mem. at 34-35.) Additionally, Defendant asserts that the School's 2014 messages are irrelevant to a continuing course of duty analysis because the messages were sent a year after Plaintiff's claims expired. (*Id.* at 36.)

Because the record establishes that Plaintiff possessed sufficient knowledge to file his claims against IMS prior to 2013, the continuing course of conduct doctrine is inapplicable to toll Plaintiff's claim. *See Rosato*, 82 Conn. App. at 405; *Rivera v. Fairbank Mgmt. Properties, Inc.*, 45 Conn. Supp. 154, 160 (Conn. Super. Ct. 1997) ("Upon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force.").

Even if Plaintiff were ignorant of the actionable harm here, this doctrine would still be of no use to him. As the Connecticut Supreme Court has explained, the "scope of the duty imposed by the student-school relationship is not limitless. The duty is tied to expected activities within the relationship. Therefore, in the student-school relationship, the duty of care is bounded by geography and time, encompassing risks such as those that occur while the student is at school or otherwise under the school's control." *Munn v. Hotchkiss Sch.*, 326 Conn. 540, 552 (2017) (cleaned up). Plaintiff has not offered any evidence that he was in any way under the Defendant's

control after his graduation from the school in 1980 until the expiration of the limitations period in 2013. Assuming *arguendo* that the 2014 messages are relevant to this inquiry, these messages appear only to express concern for the well-being of IMS alumni and do not otherwise indicate that Plaintiff remained in the School's control or that the School was otherwise assuming a legal duty toward him.

Because the continuing course of conduct doctrine does not apply, the Court lacks any basis to toll Plaintiff's undisputedly untimely claim.[8]

## IV. Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 59] is GRANTED. Judgment shall enter for Defendant. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of March 2020.

---

[8] Because Plaintiff's own knowledge of his injury precludes tolling under both the fraudulent concealment doctrine and the continuing course of conduct doctrine, the Court need not address the arguments that Plaintiff raised following briefing that IMS "admitted that it possesses evidence that is 'highly relevant to the outstanding issues of fact' in this case" in a related state court action. (Pl.'s Supplemental Submission Supp. Opp. to Mot. for Summ. J. [Doc. # 84] at 1 (quoting Def.'s Mot. to Stay, *Arrowood Indemnity Co. v. Indian Mountain Sch.*, No. HHD-CV-18-6102983-S (Conn. Super. Ct. Oct. 24, 2019) Entry No. 118.00).) Leaving aside the fact that Defendant has represented that it has "complied with all discovery in this case and there are no material issues of fact warranting denial of the School's Motion for Summary Judgment," (Def.'s Resp. to Pl.'s Supplemental Submission [Doc. # 85] at 1), further discovery on Defendant by Plaintiff would not create a dispute as to whether Plaintiff had sufficient knowledge to bring his claim, as demonstrated by Plaintiff's March 25, 2009 e-mail to Attorney Susan Smith.